AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

FILED IN CHAMBERS
U.S.D.C. Atlanta

MAY 14 2012

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

CHARLIE SHIVERS III

508 Morgan Street
Atlanta, GA 30308

CASE NUMBER: 1:12-MJ- 644

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about February, 2011, through in or about May 12, 2012, in Fulton County, in the Northern District of Georgia defendant(s), aided and abetted by others, did,

embezzle, steal, purloin, and knowingly convert to his use and the use of another records, vouchers, money, or things of value of the United States or of any department or agency thereof . . . and, without lawful authority convey and dispose of money and things of value of the United States or any department or agency thereof, in that, the defendant obtained and provided fraudulently obtained tax refund checks to others to negotiate, including: a $189,542 check, dated March 29, 2011, payable to Packaging Agents of Miami; a $326,764 check, dated September 20, 2011, payable to Southard Distributing of Tampa, Inc.; a $505,399 check, dated October 25, 2011, payable to Shipping Avenues, Inc.; and a $538,452 replacement check, dated January 10, 2012, payable to Transportation & Distributing Consultants, Inc.; and

used and caused to be used the U.S. Postal Service and other interstate carriers in furtherance of a scheme and artifice to defraud the Internal Revenue Service, of U.S. Treasury checks and the proceeds thereof issued based on fraudulent claims of fuel tax refunds.

in violation of Title 18, United States Code, Section(s) 641, 1341 and 2.

I further state that I am a(n) Special Agent of the United States Secret Service and that this complaint is based on the following facts:

See Attached Affidavit incorporated herein.

Continued on the attached sheet and made a part hereof.          (x) Yes ( ) No

_____
Signature of Complainant
ALEXANDRE HERRERA

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

May 12, 2012                                    at     Atlanta, GA
Date                                                          City and State

Linda T. Walker
United States Magistrate Judge                      _____
Name and Title of Judicial Officer                  Signature of Judicial Officer
AUSA Gale McKenzie

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

## AFFIDAVIT

I, Alexandre Herrera, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 508 MORGAN STREET, NE, ATLANTA, GA (hereinafter, the "SUBJECT PREMISES"), further described in Attachment A, for the things described in Attachment B.   This affidavit is also made in support of an application for a warrant for the arrest of Charlie Shivers III ("CHARLIE SHIVERS").

2.      I am a Special Agent with the United States Secret Service ("Secret Service"), and have been since April, 2011.   I am presently assigned to the Atlanta Field Office, where I am part of the Counterfeit Squad.   I specialize in the investigation of U.S. Treasury Check offenses and related financial crimes.   I am a graduate of the Federal Law Enforcement Training Center in Glynco, GA and the United States Secret Service's James J. Rowley Training Center in Beltsville, MD.

graduate of the Federal Law Enforcement Training Center in Glynco, GA and the United States Secret Service's James J. Rowley Training Center in Beltsville, MD. At these facilities, I underwent a seven month training program that addressed investigation techniques and other matters.

3.     My duties include the investigation of fraud crimes, including violations of Title 18, United States Code, Sections 641 (Embezzlement and Theft of Public Money, Property or Records) and 1341 (Mail Fraud). I have received training, both formal and informal, in the enforcement of the theft of and fraud laws related to the illegal possession, forgery, and negotiation of U.S. Treasury Checks, undercover operations, interviewing techniques, and the use of surveillance. I am familiar with and have used many of the traditional methods of investigation, including, without limitation, visual surveillance, informant and witness interviews, consensually recorded telephone conversations, defendant debriefings, the use of confidential sources, undercover operations, execution of search warrants, the seizure of U.S. Treasury Check fraud evidence, and controlled purchases of fraudulently obtained U.S. Treasury Checks.

4.     I have investigated more than thirty (30) U.S. Treasury Check cases and participated in many more in which traditional methods of investigation were

used to identify suspects and gather evidence for crimes connected with the forgery, theft, possession, and fraudulent filing of U.S. tax returns.

5.      Based upon training and experience, I am familiar with the ways in which criminals involved in U.S. Treasury Check fraud conduct their business, including the various ways they obtain stolen and fraudulent U.S. Treasury Checks, distribute the U.S. Treasury Checks, negotiate the U.S. Treasury Checks, and use cellular telephones to facilitate their criminal activity. For instance, I know that criminals involved in fraudulent tax return filing activity will file documents with the secretary of state corporations department in the respective state to appear that the company name is a legitimate operating business. They will then file a fraudulent tax return with the IRS to receive a U.S. Treasury Check refund. The criminals often times will open a bank account under the name of the company that the fraudulent U.S. Treasury Check was issued to, then they will deposit the check into the account.

6.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and witnesses and document review. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my

knowledge about this matter. Where the contents of documents and statements are discussed, they are provided in sum and substance.

## FACTUAL BACKGROUND

7. The Fuel Tax Credit is a refundable credit for the federal tax paid on certain fuel purchases, primarily those for off-road use such as by tractors or logging operations. A corporation claims this credit on a Form 1120 or 1120S income tax return. Because the credit is a refundable credit, a taxpayer can receive a refund over and above the amount of the taxes owed.

## THE PREDICATE OFFENSES

8. Chiefly, I am seeking fruits, evidence and instrumentalities of violations of criminal intellectual property laws further described below.

9. Title 18, United States Code, Section 641 provides, in pertinent part, that:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof. . . or [] receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted – shall be fined under this title or imprisoned not more than ten years, or both. . .

18 U.S.C. § 641.

4

10.    Title 18, United States Code, Section 1341 provides, in pertinent part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier. . . shall be fined under this title or imprisoned not more than 20 years . . .

18 U.S.C. § 1341.

## THE SUBJECT PREMISES

11.    The SUBJECT PREMISES comprises a unit in a duplex, 508 Morgan Street, NE, Atlanta GA 30308.  There are two front doors on the front of the structure containing the SUBJECT PREMISES at street level; however, only the one closest to the driveway of the structure is marked with the address 508, that of the SUBJECT PREMISES.  The driveway to the structure containing the SUBJECT PREMISES goes downhill to a garage on the level one story beneath the front entrance level.  Next to the garage doors, there is another exterior door marked with the number 508, and leading to the SUBJECT PREMISES.  A photograph of the SUBJECT PREMISES appears below:



## PROBABLE CAUSE

### I.     The CI's Background

12.     The FBI investigated CI #301-121033 ("CI") for mortgage fraud. The CI confessed to mortgage fraud violations, and had agreed to plead guilty after cooperating with the government against other violators.  Before being charged for this first scheme, the CI engaged in a second mortgage fraud scheme.  During the course of the second scheme, the CI attempted to mislead law enforcement agents. The investigation of the second mortgage fraud scheme was ultimately completed, and the CI was charged with, and pleaded guilty to, both schemes.

13.     After being confronted with the second scheme, the CI agreed to plead guilty to both schemes and again agreed to cooperate with the Government.  The

CI entered into recorded telephone calls and face-to-face meetings, and provided texts, e-mails and other documents which incriminated six co-conspirators (all of whom ultimately plead guilty and verified the information provided by the CI). In January 2012, the CI's sentence was enhanced under the sentencing guidelines for obstruction of justice for his actions in attempting to mislead the law enforcement agents concerning the second scheme. The CI also received a downward departure under Section 5K of the U.S. Sentencing Guidelines for his cooperation. The CI received a sentence of 151 months confinement followed by five years of supervised release, and was ordered to pay restitution of over $3 million.

14. The CI was initially scheduled to report for confinement in late April. The report date was extended for 60 days to allow him to cooperate in this investigation. The CI hopes to receive a reduction of sentence under Rule 35 of the Federal Rules of Criminal procedure for his cooperation in this case.

15. The CI and the CI's brother have known CHARLIE SHIVERS and his brother Anthony Shivers ("ANTHONY SHIVERS") since junior high school, and are all good friends.

## II.  The CI's Contacts with ANTHONY and CHARLIE SHIVERS

16. After the CI's federal criminal sentencing in January 2012, the CI and his family began looking for opportunities for the CI to cooperate with federal law

enforcement in the hope of receiving a reduction of the CI's sentence under Rule 35.

17.    In approximately February 2012, the CI's brother was riding as a passenger in ANTHONY SHIVERS's vehicle when he saw a U.S. Treasury check for $538,452.00. Hoping that the information about the check might prove useful, the CI's brother took a photograph of it with his cell phone camera, which he later sent to the CI. The photograph showed that the check had been issued on January 10, 2012, and was made out to "Transportation and Distributing Consultants, Inc." A notation on the upper right hand corner of the check visible in the photograph stated "F.1120 REF". Agents later downloaded this photograph from the CI's phone.

18.    Subsequently, the CI talked with ANTHONY SHIVERS in a social visit. During the visit, ANTHONY SHIVERS told the CI about the $528,000 check. ANTHONY SHIVERS described a scheme in which CHARLIE SHIVERS was getting government checks like the $538,000 check. ANTHONY SHIVERS told the CI that CHARLIE SHIVERS would gather the names of old or defunct corporations from Florida on the internet, and then open new corporations in Georgia through the Secretary of State with the same names. According to ANTHONY SHIVERS, CHARLIE SHIVERS would then prepare corporate

federal income tax returns in the names of the corporations, and get a large refund based on a "gas refund." According to ANTHONY SHIVERS, CHARLIE SHIVERS preferred to use the names of corporations that sounded like they were related to the transportation industry. ANTHONY SHIVERS also stated that in January, 2012 CHARLIE SHIVERS had purchased a computer program costing $1,200 to facilitate filing the tax returns. ANTHONY SHIVERS stated that CHARLIE SHIVERS performed all of the work related to the scheme at his home, the SUBJECT PREMISES.

19. In early March 2012, the CI met with ANTHONY SHIVERS and CHARLIE SHIVERS outside the SUBJECT PREMISES. At the beginning of the visit, the CI and ANTHONY SHIVERS were outside talking. Later, CHARLIE SHIVERS came outside and joined the conversation. When discussing the scheme to obtain the U.S. Treasury checks, CHARLIE SHIVERS said, "I'm the brains." CHARLIE SHIVERS also described himself as taking care of his brother ANTHONY SHIVERS financially, including providing ANTHONY SHIVERS with $10,000 for the purchase of ANTHONY SHIVERS'S new truck. CHARLIE SHIVERS said that he had two U.S. Treasury checks on their way to him, one around $300,000 and one about $500,000.

20.    On April 16, 2012, the CI spoke with ANTHONY SHIVERS concerning how the U.S. Treasury checks obtained through the scheme are converted to cash. ANTHONY SHIVERS stated that CHARLIE SHIVERS used to use "Derrick" to cash checks, but had stopped because "Derrick" was under investigation. Subsequently, ANTHONY SHIVERS explained that CHARLIE SHIVERS started cashing checks through "Scott." ANTHONY SHIVERS also stated that the money from a $538,000 check was currently frozen in the account of a check-casher named "Cal", and that "Cal" was under investigation by the IRS. Audio and video from this meeting was recorded by the CI on his cell phone.

## III.    The Undercover Investigation

21.    Subsequently, the CI called ANTHONY SHIVERS by phone and stated that he had a contact who could cash checks for CHARLIE SHIVERS and ANTHONY SHIVERS. ANTHONY SHIVERS asked the CI to set up a meeting with the contact.

22.    On April 25, 2012, the CI introduced an undercover DeKalb County Police Officer to ANTHONY SHIVERS. The CI told ANTHONY SHIVERS that the undercover officer's name was "Michelle," and that she was the manager of a check-cashing store.

23.    At the April 25, 2012 meeting, ANTHONY SHIVERS asked Michelle how she was able to cash checks, and how large of checks she could handle.  After hearing Michelle's answers, ANTHONY SHIVERS asked her to negotiate a check of approximately $5,000 the following week.  ANTHONY SHIVERS also stated that someone had messed up a check by signing the back of it, and that they had to have it reissued.  ANTHONY SHIVERS said that some of the checks he will need to have cashed are made out to corporations.

24.    After Michelle left the April 25, 2012 meeting ANTHONY SHIVERS talked with the CI about which individuals involved in his scheme were vulnerable to law enforcement and/or criminal prosecution.  ANTHONY SHIVERS indicated he was concerned that Cal might be arrested, would "fold" because he had opened a corporation with the Secretary of State and opened an account in the same name as the check, and would talk to law enforcement; that Scott was lawyered up and would be "OK," and that CHARLIE SHIVERS was in good shape because no one could tie him to the scheme.  This meeting was recorded and observed by U.S. Secret Service special agents and DeKalb County police detectives.

25.    In early May, 2012, ANTHONY SHIVERS called the CI, and the CI returned his call.  ANTHONY SHIVERS stated that "his guy" had an $80,000.00 check that he wanted to get cashed.  ANTHONY SHIVERS stated that "his guy"

wanted to meet Michelle. ANTHONY SHIVERS mentioned the possibility of stealing the money from the check, rather than returning it to "his guy." Michelle later called ANTHONY SHIVERS back and asked for additional information about this proposed transaction. Michelle's call was recorded by the DeKalb County police.

26.   On May 10, 2012, the CI asked ANTHONY SHIVERS for CHARLIE SHIVERS's cell phone number. ANTHONY SHIVERS stated that CHARLIE SHIVER's cell phone number was (404) 337-2935. The CI called CHARLIE SHIVERS on May 10 on the cell phone. During the call, CHARLIE SHIVERS told the CI that his cell phone service was about to be disconnected, and asked the CI to call him at his home instead, at (404) 939-8153. CHARLIE SHIVERS and the CI agreed to get together the following day.

27.   On May 11, 2012, at approximately 2:00 pm, the CI drove to the SUBJECT PREMISES and entered by the side door near the garage bearing the number 508. The CI was inside the SUBJECT PREMISES with CHARLIE SHIVERS for approximately 45 minutes. The CI has identified the photograph above as being the SUBJECT PREMISES. The CI entered through the kitchen, and met with CHARLIE SHIVERS in the living room. The living room contained a couch, chair, desk, laptop computer, a black canvas bag with wheels, and lots of

papers and clothing.  Files of paperwork were in crates near the desk, on the desk, and on the floor.  The CI observed two doors which appeared to lead to bedrooms, one of which he observed on a trip to the bathroom.

28.    The CI observed that CHARLIE SHIVERS appeared to have one or more roommates at the SUBJECT PREMISES.  Approximately 20 minutes into the visit, loud music began coming from what appeared to the CI to be a bedroom door.  CHARLIE SHIVERS commented the person has a music studio and sometimes makes recordings.

29.    During the May 11, 2012 visit, which the CI recorded, CHARLIE SHIVERS told the CI that he wore latex gloves and covered his hair in order to protect the tax returns from being contaminated by his DNA while he was working on them.  CHARLIE SHIVERS also told the CI that he did not send the returns to the IRS service center in Atlanta for processing, because it was too "hot."

30.    CHARLIE SHIVERS also told the CI that he previously had his U.S. Treasury Checks sent to California, New York and Oklahoma.  The recipients in those states were to mail the checks back to CHARLIE SHIVERS for cashing.

31.    CHARLIE SHIVERS told the CI that the government was so stupid, that he had been able to use the same template to obtain three tax refunds.

32.   CHARLIE SHIVERS described what he was doing as "a good hustle" and "free money."

33.   CHARLIE SHIVERS told the CI he had received a total of approximately $3 million in U.S. Treasury checks over the past two years, including one check of approximately $800,000.  CHARLIE SHIVERS said that others were messing up the "game" by trying to get $5 million refunds at one time, rather than getting multiple checks of smaller amounts.

34.   CHARLIE SHIVERS showed the CI several color copies of six-figure U.S. Treasury Checks, which he withdrew from a folder in a black canvas wheeled bag.  As he flipped through the pages containing the color copies of the checks, CHARLIE SHIVERS read several dates from the checks.  CHARLIE SHIVERS mentioned checks dated 9/20/2011, 9/27/2011, among other checks.  CHARLIE SHIVERS also showed the CI a reissue form for the $538,000 check, which had been replaced.

35.   CHARLIE SHIVERS discussed the $538,000 check that he said had been mailed to an individual in California who was supposed to mail it back to CHARLIE SHIVERS.  CHARLIE SHIVERS stated that he had arranged to pay the individual in California a set fee for receiving the check in the mail and overnighting it back to CHARLIE SHIVERS.  However, CHARLIE SHIVERS

told the CI that the individual in California had tried to cash the check himself and keep the money. This effort had been unsuccessful, and the bank had refused to cash the check for the individual in California. CHARLIE SHIVERS explained that he had subsequently filled out paperwork and obtained a replacement check in the same amount from the IRS.

36.     CHARLIE SHIVERS explained that he started doing his own returns after watching another guy get a $700,000 U.S. Treasury check.

37.     CHARLIE SHIVERS told the CI about another incident in which the person who was supposed to receive the check in the mail and forward it to him, without revealing the location of that individual. CHARLIE SHIVERS related that, rather than sending the envelope to CHARLIE SHIVERS for the agreed-upon fee, the individual held the envelope up to the light, saw that the check it contained was for a large amount, and demanded half of that amount to return it to CHARLIE SHIVERS. CHARLIE SHIVERS related that he told the individual he would not split the money, as he had twenty more such checks.

38.     My understanding is that CHARLIE SHIVERS arranged for tax refund checks to be mailed to one set of individuals, and cashed by another group of individuals, all of whom were distinct from himself, in order to make it more difficult to detect his involvement in the scheme.

39.     CHARLIE SHIVERS told the CI that his submission of the tax returns was "a numbers game." He explained that he would fill out many tax returns, but only receive refund checks back for a percentage of them.

40.     CHARLIE SHIVERS told the CI that he was expecting two additional checks, and that he was going to "hibernate" until they arrived. Specifically, CHARLIE SHIVERS told the CI that he had recently returned to Atlanta from visiting his girlfriend in Australia, and had a new passport, which contains a computer chip. CHARLIE SHIVERS also said he was leaving town on May 12, 2012, and would be gone until he received word that the "shit," or checks, had arrived.

41.     As the CI left the SUBJECT PREMISES on May 11, 2012, a roommate of CHARLIE SHIVERS's, Stephen, drove up. I observed the license plate of the car driven by Stephen, and ran it through a law enforcement database, which confirmed that it is registered to him at the SUBJECT PREMISES.

## IV.    Information Corroborating the CI

42.     Information provided by the U.S. Treasury and by Wells Fargo Bank corroborates the information provided and recordings made by the CI.

43.     The CI had reported that ANTHONY SHIVERS had stated that the $538,452.00 check had been reissued. When I contacted the U.S. Treasury, an

employee there confirmed that the check had been reissued on January 10, 2012, and that the original check had been issued on September 27, 2011. The Treasury employee also stated that the replacement check had been deposited into a Wells Fargo account.

44.     An investigator for Wells Fargo bank confirmed that the $538,452.00 U.S. Treasury Check, which the CI had provided a photograph of to me, made out to the order of Transportation and Distributing Consultants, Inc., in Desert Hot Springs, California, was deposited into a Wells Fargo bank account owned by Calvin and Cordell Barnes.

45.     The Wells Fargo investigator located a second U.S. Treasury check in the amount of $505,399, dated October 25, 2011, payable to Shipping Avenues, Inc. and addressed to Seffner, Florida, which had been negotiated through another Wells Fargo account on which Calvin Barnes was an authorized signatory. That check also had been endorsed in the name Calvin Barnes.

46.     On April 16, 2012, the CI made a video recording of ANTHONY SHIVERS stating that CHARLIE SHIVERS had used "Derrick" to negotiate checks, until running into problems and switching to "Scott," and that the $538,000 check was currently frozen in Calvin's account. A Wells Fargo investigator confirmed that after the $538,452.00 check was deposited into the account of

Calvin and Cordell Barnes, checks were written on that account to the order of both Reynolds Scott and the Klein Group.  According to Wells Fargo, the Klein Group account is controlled by Derrick Lawson.

47.     Additionally, Wells Fargo identified two U.S. Treasury checks as having been deposited directly into bank accounts controlled by Derrick Lawson. One check, dated September 20, 2011, was in the amount of $326,764.00 to payee Southard Distributing of Tampa Inc., with address in Tulsa, OK. The other check, dated March 29, 2011, was in the amount of $189,452.00 to payee Packaging Agents of Miami, with address in New York, NY. This information corroborates the claim made by CHARLIE SHIVERS to the CI during a recorded conversation on 5/11/12, that he had previously had checks sent to addresses in NY, OK, and CA, and ANTHONY SHIVERS's statements that CHARLIE SHIVERS had first used Derrick to negotiate the checks, and later Cal.

48.     I have examined copies of all four U.S. Treasury checks and observed from the print on the front of the checks that they are all IRS refund checks related to corporate tax returns.

49.     The CI has advised that neither CHARLIE SHIVERS nor ANTHONY SHIVERS have been involved in any income-generating transportation businesses during the time of their acquaintance.

18

50.     Based on the above information, Affiant believes CHARLIE

SHIVERS committed acts in violation of Title 18 U.S.C. Sections 641 and 1341.

## TECHNICAL TERMS

51.     Based on my training and experience, I use the following technical

terms to convey the following meanings:

     a. Internet: The Internet is a global network of computers and other
electronic devices that communicate with each other.  Due to the
structure of the Internet, connections between devices on the Internet
often cross state and international borders, even when the devices
communicating with each other are in the same state.

     b. Storage medium: A storage medium is any physical object upon
which computer data can be recorded.  Examples include hard disks,
floppy disks, flash memory, CD-ROMs, and several other types of
magnetic or optical media not listed here.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

52.     As described above and in Attachment B, this application seeks

permission to search for records that might be found on the SUBJECT PREMISES,

in whatever form they are found.  Among other forms, records might be found in

data stored on a laptop computer hard drive, USB thumb or flash drives, or other

storage media.  Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

53.   I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe records containing evidence of a crime related to  Title 18, United States Code, Section 2320 (Trafficking in Counterfeit Goods or Services) would be found on  that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic

evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based upon statements provided by the CI, ANTHONY SHIVERS has stated that CHARLIE SHIVERS purchased software costing $1,200.00 in January 2012, to facilitate the preparation of corporate federal income tax returns. ANTHONY SHIVERS has also stated that CHARLIE SHIVERS uses the internet to learn the names of companies to use in his scheme, and that he does all of his work related to the scheme at home. Based on this statement, I believe there is probable cause to believe that SHIVERS has possession of a computer at the SUBJECT PREMISES.

54. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer or storage media in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While

it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

55. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

56.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence

described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

64.    Based upon the information above, there exists probable cause to believe that within the SUBJECT PREMISES, there exists evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 641 and 1341; as well as probable cause for an arrest warrant for CHARLIE SHIVERS.