1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4     UNITED STATES OF AMERICA,        )
                                       )
5          Plaintiff,                  )
                                       )
6     -vs-                             )   Case No. 1:12-CR-181-TWT
                                       )
7     CHARLIE SHIVERS, III,            )   May 15, 2012
                                       )   Atlanta, Georgia
8          Defendant.                  )
      _____ )
9

10

11         TRANSCRIPT OF THE PRELIMINARY AND DETENTION HEARING
              BEFORE THE HONORABLE ALAN J. BAVERMAN,
12                  U.S. MAGISTRATE COURT JUDGE

13

      APPEARANCES OF COUNSEL:
14

15    On behalf of the Government:   Gale McKenzie
                                     Alana Black
16                                   Office of the U.S. Attorney

      On behalf of the Defendant:   Jennifer Hanson
17                                   Office of Bruce S. Harvey

18

19

20          *Proceedings recorded in digital audio format
             and computer-aided transcript produced by*

21
                        SUSAN C. BAKER, RMR, CRR
22                       2194 U.S. COURTHOUSE
                        75 SPRING STREET, S.W.
23                       ATLANTA, GA  30303
                          (404) 215-1558
24

25

2

1            (Proceedings held in Atlanta, Georgia, May 15, 2012,
2    in open court, Defendant present.)
3            THE COURT:  All right.  The next case is the case of
4    United States of America versus Charlie Shivers, III.  It's
5    Case Number 1:12-MJ-644.  Ms. McKenzie and Ms. Black are here
6    representing the United States, and Ms. Hanson is here
7    representing Mr. Shivers.  I set this over for a preliminary
8    hearing and detention hearing.
9            Is everyone ready?
10           MS. MCKENZIE:  Yes, Your Honor, ready for the
11   Government.
12           MS. HANSON:  Yes, Your Honor, we're ready.  And it
13   doesn't make any difference for a written record; but for the
14   Court's edification, his name is pronounced Shivers.
15           THE COURT:  Shivers.  I'm sorry.
16           MS. HANSON:  No problem.
17           THE COURT:  With a last name like Baverman, I'm very
18   sensitive to correct pronunciations of last names.  So I
19   apologize, Mr. Shivers.
20           All right.  Ms. McKenzie, you may proceed.
21           MS. MCKENZIE:  Your Honor, as far as detention goes,
22   if I could make a statement, a proffer supported by exhibits
23   that have been provided to the defense.  And if I may hand up
24   to the Court first 1 through 12.
25           THE COURT:  Any objection?

3

1        MS. HANSON:  I do object to the Government's Exhibit

2  1 with regard to relevance as to detention.

3        MS. MCKENZIE:  Your Honor, Government's Exhibit 1 are

4  the treasury checks or the false refund checks and the tax

5  returns found in the search of the Defendant's residence this

6  past Saturday.  And they total about -- just under $5.5

7  million.

8        THE COURT:  Ms. Hanson?

9        MS. HANSON:  I'm not certain how that relates to

10  detention.

11       THE COURT:  Well, I think I'll let the exhibit in and

12  I'll let Ms. McKenzie try to explain how it relates to

13  detention.

14       MS. MCKENZIE:  First of all, the Defendant is facing

15  ten years in custody under the guidelines.  So there's

16  basically no reason to stay in the United States.  The

17  Defendant was recorded with a CI on last Saturday -- Friday,

18  the 11th; and he is telling the CI that, I'm gone, I'm outta

19  here, I'm gone.

20       He has tremendous ties to Australia.  He is talking

21  marriage to a girlfriend there.  He has traveled to Australia a

22  number of times.  He has -- Government's Exhibit 2 and 3 are

23  plane tickets where he goes to LAX and then on to Australia,

24  and one of them shows a money conversion of $10,000.

25       Also, the Defendant said on the tape, and his records

4

1    reflect, that he has multiple bank accounts in Australia.

2    That's Exhibit 4 and Exhibit 5 are accounts at the Bank of

3    Melbourne and the Commonwealth Bank in Australia.  And Exhibit

4    6 is a list of bank account numbers in Australia and Swift

5    transfers.  Those came from the Defendant's records obtained

6    via search warrant this past Saturday; and they are dated in

7    2012, actually in March of '12.  We know the last time the

8    Defendant went to Australia was March 28th, 2012.

9            And what is so unfortunate is even though we had a

10   red flag out for him the records that Secret Service has access

11   to did not show to this day that he ever returned to the United

12   States.  But he's clearly here.  So we can't monitor his travel

13   even though when we were trying to do so we weren't able to do

14   -- monitor his international travel.

15           Government's Exhibit 7 is a letter from Chase to the

16   Defendant here in the States which is cutting him off from

17   banking with Chase because of the questionable transactions.

18           The Defendant on his tape -- on the tape from last

19   Friday, May the 11th, said he had bought a new pad in

20   Australia.  And his records that were seized during the search,

21   Government's Exhibit 8, shows a listing of Australian

22   residences.  They support each other that he has the pad in

23   Australia because there's the listings and so forth.

24           His records that were seized on Saturday include

25   Government's Exhibit 9 which talk about importing vehicles to

5

1    Australia.  The Defendant has a Corvette here in Atlanta, and

2    he was talking to the CI that he was originally planning on

3    taking his car to Australia.  However, now he is having to

4    leave the car and hit the eject button and go boom, a quote

5    from the Defendant on that tape.

6            In addition, the Defendant on the tape says that he's

7    making -- bringing in three to four million dollars gross from

8    an import/export business in Australia.  So we would just get

9    new stuff there.  That's -- also shows that there's no reason

10   that he would have to stay in the United States.

11           The 508 address where he stayed, Morgan Street in

12   Atlanta where he stayed when -- on the times that he visited

13   Atlanta was a couch in a living room.  He didn't even have a

14   bedroom there.  So we don't believe he has strong ties to

15   Atlanta.

16           Yes, he does have a brother here; but he keeps

17   talking about on the tape about breaking ties 'cause he has to

18   support the brother and everything here.  He talks about on the

19   tape about -- and I have a rough transcript for the Court with

20   these highlights highlighted -- it's very rough -- which I'll

21   hand up in just a moment.  But --

22           THE COURT:  Is that Number 10?

23           MS. MCKENZIE:  That was the agent's notes, but -- who

24   listened to the tape again last night.

25           But Number 11 -- and I have provided the defense with

1    a -- let them read my highlighted copy and provided them with a

2    copy plus the tape itself.

3            He talks about on the tape going to have to

4    hibernate, to tuck his stuff away here and hop on a plane and

5    hibernate until he gets a call, that he is expecting two more

6    checks, a $300,000 one and a $500,000 one.  And he's going to

7    hibernate.

8            He says on the tape in all these on Government's

9    Exhibit 11 which is the very rough transcript -- he says he's

10   fixing to be across the Pacific.  He said that on Friday.  And

11   he was leaving on Saturday for the first leg of his trip, that

12   is, to L.A..  And you'll see from the exhibits, his prior plane

13   tickets he would go to L.A. for a few days and then on to

14   Australia.

15           He admits on this tape of getting $3 million in

16   refund checks during the past two years, and he shows the CI a

17   number of the checks that are listed on Government's Exhibit 1.

18   You can see when I've got a date in the column for checks those

19   are the checks he showed the CI.  And the other entries are

20   returns that were recovered during the search also that don't

21   have any checks matching them in the Defendant's possessions as

22   of Saturday -- or Friday.  But the total -- and he explains on

23   the tape that this is a game filing all these returns, and he's

24   gotten approximately $3 million back out of filing the multiple

25   returns which these returns that he had in his possession

1  totaled almost 5.5 million.

2          There are two Social Security numbers that the -- for

3  the Defendant on his rap sheet.  Another quote from the

4  Defendant's tape on Friday is that, I'm going to work out, get

5  in shape, go to another country and be the baddest MF a lady

6  will ever meet.  And he goes on to say about he's got to leave

7  now because -- he uses the N word; I'm going to use

8  "co-conspirators" -- are, quote, taking away my breathing room,

9  so it's time to go.  I done sold them everything.  Just go.

10 And some of the other highlights there are, Gotta hit the eject

11 button and boom.  I gotta get out of town and keep going, don't

12 know why I came back in the first place.  He says also that he

13 has enough money to sustain him over there, mentions his bank

14 accounts in Australia and grossing three to four million in

15 Australia in the import/export business.

16         Moreover, the present scheme can be conducted from

17 abroad as well as here.  The Defendant filed paper returns, so

18 in various IRS centers -- so they couldn't be traced back to

19 the IP address.  He wore as he says on the tapes gloves and

20 body protection so his DNA wouldn't get on the returns.

21         Each time he filed a return he used a different --

22 he reactivated somebody else's company and just used a shell

23 company name to file returns.  Every time it's a different

24 company name, and the checks are sent to different addresses

25 every single time.  So there's no way to trace that.

8

1            And then the Defendant has another set of people

2    negotiate those checks for him, so that can be done from abroad

3    as well as from here.  He could still bring in -- and the

4    Government can't even -- the two outstanding checks, the 300

5    and 500 thousand that Charlie Shivers and Anthony Shivers, his

6    brother, have talked about for several weeks now, we can't put

7    a stop on them because we don't know what corporation name he

8    used and what address it was sent to or the specific amounts in

9    order to put a hold on it.

10           So he's got an unlimited source of funds.  He's made

11    the statement that he's leaving.  He's got a support of his

12    girlfriend who he is talking about marrying in Australia and

13    his assets moved to Australia.

14           But one of the most disturbing things that supports

15    detention more than anything else is the Defendant's attempt to

16    mislead this Court on Monday.  The Defendant told the probation

17    officer that his girlfriend in Australia -- and I have marked

18    this as Government's Exhibit 12, the pre-sentence -- Pretrial

19    Services Report.  He told the Pretrial Services officer that

20    that was his ex-girlfriend, and from the transcript and the

21    tape itself it's clear that this is not an ex-girlfriend.  And

22    he does have many more ties to Australia, and he has already

23    made up his mind to leave and has a support system both

24    emotional and economic already set up in Australia.

25           The second prong of the Government's argument for

9

1    detention in addition to risk of flight is the economic danger

2    to the community.  The Defendant continued his scheme, very

3    substantial scheme, after learning that other of his

4    co-conspirators were under investigation by the Secret Service

5    and IRS, Derrick Lawson, Calvin and Cordell Barnes, Reynold

6    Scott, Leroy Carter.  He was actually -- Defendant was actually

7    present during some of the interviews when the agents showed up

8    to interview at least one of these -- at least one of the

9    interviews connected with these other investigations.

10            Leroy Carter was sentenced to jail last week, and he

11   knows that these other people are under investigation.  In

12   fact, there's conversations about who's going to talk and who's

13   not going to talk and the concerns; and that's one of the

14   reasons that he was planning to leave Saturday of last week and

15   also to make arrangements to receive the extra $800,000-plus

16   that he expected to come in.

17            He didn't slow up.  And there are other documents

18   that we seized that appear that he may have been filing returns

19   that don't appear on Government's Exhibit 1.  And the way he

20   structured the scheme, as I stated, he has continued it after

21   he has known about the criminal investigations and he can

22   continue it if he were released.  And that's -- certainly the

23   taxpayers are overly burdened as it is and to have millions of

24   dollars in these gas refund tax credits to be sent back when

25   the Defendant never ever had a business that had any off-road

10

1    trucking involved in the business.

2            The tape alone from April the 11th --

3            THE COURT:  May the 11th.

4            MS. MCKENZIE:  May the 11th.  The May the 11th tape

5    also establishes probable cause that the Defendant was involved

6    in this scheme and was filing these tax returns, and he knew it

7    was wrong because he was covering up his fingerprints and his

8    DNA so he couldn't be detected.  And Government's Exhibit 1

9    shows over $5.5 million involved in this scheme that was in the

10   Defendant's possession.

11           So I think that the exhibits that we have introduced

12   establish probable cause that the Defendant committed these

13   crimes and that there is no condition that the Court could set

14   that would ensure his appearance because in his own words he

15   said, I'm outta here, I'm gone.  They've taken away my

16   breathing room.  It's time to go, hit the eject button.  And he

17   has got enough money to sustain him abroad.

18           THE COURT:  I think you have to put up evidence on

19   the PC, so --

20           MS. MCKENZIE:  I'm going to call the agent for that.

21   I was just...

22           Alex, Agent Herrera?

23           (Witness placed under oath by the clerk.)

24           THE CLERK:  Please have a seat.  State and spell your

25   name for the record.

11

1       THE WITNESS:  Yes.  It's Alexandre Herrera,

2   A-l-e-x-a-n-d-r-e, last name H-e-r-r-e-r-a.

3                       -  -  -

4                   ALEXANDRE HERRERA,

5   having been first duly sworn, was examined and testified as

6   follows:

7                   DIRECT EXAMINATION

8   BY MS. MCKENZIE:

9   Q.   How are you employed, sir?

10  A.   I'm a special agent with the United States Secret Service.

11  Q.   Have you been assigned to the investigation of the Charlie

12  Shivers, III, case and others?

13  A.   That's correct.

14  Q.   Okay.  How did that Mr. Shivers come to your attention?

15  A.   From information generated from the CI.

16  Q.   Okay.  Did the CI provide you any documentation?

17  A.   He did.

18  Q.   What was that?

19  A.   A photocopy of a United States Treasury check that was

20  issued fraudulently or filed fraudulently and as well as taped

21  conversations and other conversations with Anthony Shivers

22  which is the brother of Charlie and with Charlie.

23  Q.   Okay.  What company was that check issued to?

24  A.   Transportation and Distributing Consultants, Inc.

25  Q.   Okay.  And what was the refund -- was it an IRS refund

12

1    check?

2    A.    It was.

3    Q.    And you can tell that by looking at the check?

4    A.    I can.

5    Q.    Are you trained in those -- examining treasury checks?

6    A.    I can -- yes, I am.

7    Q.    Okay.  And what was the check issued for?

8    A.    It was for a tax -- a fuel tax refund for -- specifically

9    for off-road fuel consumption.  And it's a program that the IRS

10   has, the government has that if they claim a certain amount of

11   gallons -- and it's usually in the thousands of gallons to

12   receive a check like this -- then they are able to hold that

13   against the taxes that they owe basically, and they can -- and

14   they are able to be issued a check minus what they owe.

15   Q.    Okay.  Has your research and interview of witnesses

16   determined whether or not the Defendant ever owned off-road

17   trucking businesses?

18   A.    No research has shown that he has owned a trucking

19   business.

20   Q.    Okay.  Did you check with the Department of Treasury to --

21   did the CI tell you anything else about this $538,000 check?

22   A.    He told me that this was a re-issued check and that the

23   original one was messed up when someone tried to negotiate it

24   and that Charlie filed paperwork to be able to get a check

25   re-issued so he could negotiate.

13

1    Q.    Okay.  And was that confirmed during the May 11th taped

2    conversation between the CI and the Defendant?

3    A.    That was confirmed two obvious times.  One time was during

4    the tape.  And then also -- when I first received a copy of the

5    check, I took it to the Department of Treasury, sent them a

6    copy; and they provided paperwork to show the check was

7    re-issued.  The -- and the second one was deposited

8    successfully.

9          And then during the CI conversation on tape on May the

10   11th, Charlie Shivers explained to the CI his scheme and how he

11   got the re-issued check because someone messed up the first one

12   because they tried to take his money from the check.  And he

13   showed him the paperwork as well, and the paperwork was also

14   seized the next -- the following day during the search warrant.

15   Q.    And when you say paperwork, what kind of paperwork?

16   A.    Charlie had a copy of the original check and the messed-up

17   endorsement on the back.  So the bank obviously returned him

18   the original check, and he had that in his possession.  And

19   then he also had a copy of the re-issued check and the

20   original.

21   Q.    And what about the form that requested re-issuance of the

22   check?

23   A.    He had paperwork that you would -- you would file to

24   return -- to get a re-issued check --

25   Q.    Okay.

14

1   A.    -- and other tax documents as well there.

2   Q.    Okay.  Now, after you verified some of what the CI was

3   telling you, did you instigate an undercover operation?

4   A.    We did.

5   Q.    Okay.  Did you receive anything else from the CI prior to

6   that -- the undercover work?

7   A.    I received a -- along with a copy of a check, I also later

8   received a video of Anthony Shivers, the brother of Charlie.

9   And in the video, Anthony gave many details on the scheme.

10   Q.    Okay.  And what was Mr. Charlie Shivers' part of the

11   scheme according to his brother?

12   A.    Charlie was the brains behind -- and that's in Charlie's

13   own words according to our CI as well as he was the brains of

14   the operation, and he was the one that was filing the

15   fraudulent tax returns.

16   Q.    Okay.  And how were -- did Mr. Charlie Shivers ever state

17   on tape where he was having the refund checks sent?

18   A.    He did.  He listed New York, Oklahoma and California as

19   states that he would send the check to.

20   Q.    And was he paying anybody to take possession of those

21   checks and send them to him?

22   A.    He would pay 10,000 or 15,000 dollars for someone to

23   receive the check at an address and then send the check to him.

24   Q.    And did he have -- and was the 538,000 one of those

25   checks?

1  A.  It was.

2  Q.  Where was it sent?

3  A.  It was sent to Desert Hot Springs, California.

4  Q.  And that was the person who received it tried to cash it

5  on him?

6  A.  He did.

7  Q.  Did he have problems according to Mr. Shivers, Charlie

8  Shivers, on tape with another such individual holding the check

9  hostage?

10  A.  Yes.  The CI stated that he had held -- one of the people

11  that received the check held the envelope up into the light and

12  revealed the amount on the check which possibly he didn't know

13  what the amount was; and with him only getting paid 10 or 15

14  thousand dollars he became greedy according to Charlie and the

15  CI, and he threatened to negotiate the check himself.  Charlie

16  is on tape explaining to the CI that he told him to tear it up,

17  graphically told him to tear it up, I've got 20 more.

18  Q.  Okay.  Now, once you received from the CI the copy of the

19  $538,452 check, did you determine from the Department of

20  Treasury where that was negotiated?

21  A.  I did.  It was negotiated at Wells Fargo Bank.

22  Q.  And then did you subpoena Wells Fargo records to determine

23  what happened to those proceeds?

24  A.  I did.

25  Q.  And where did those proceeds go just generally?

16

1    A.   They went to a bank account owned by signers Cordell and

2    Calvin Barnes.

3    Q.   And did they share any of the money with other people?

4    A.   They did.

5    Q.   And who were they?

6    A.   They distributed the funds to the Klein Group which is

7    owned by Derrick Lawson.  They distributed the funds to a

8    Reynold Scott.  They distributed the funds to several others.

9    Q.   Okay.  And is there anything on the tapes with Charlie and

10   Anthony Shivers that talk about who they were -- the names of

11   the people they were having negotiate their checks at the time?

12   A.   There is.  With Anthony he has mentioned the name Cal.  He

13   has mentioned -- he has actually mentioned the name Calvin as

14   well.  He has mentioned -- and Cal, Cal or Calvin, is --

15   Anthony knew that the money was held up in Cal's account, and

16   he knew that Cal was under -- which he was under investigation

17   and that he thought -- he says this on tape that he thought he

18   was going to get wrapped up or caught and then start talking.

19   And Charlie also said it on tape that his money was tied up.

20   However, I'm not sure if they know the intent of Cal with the

21   funds.  But they knew --

22   Q.   In fact, was the money tied up?

23   A.   That was the money tied up according to tape-recordings

24   from Anthony and Charlie.

25   Q.   But, in fact, co-conspirators have spent that one?

17

1    A.    They have.

2    Q.    Okay.  And was Derrick mentioned on tape and Scott as the

3    people that were negotiating the checks for him?

4    A.    They were.

5    Q.    Okay.  Now, did you -- by checking the accounts of Cal and

6    Derrick, did you find other fraudulent IRS tax refund checks

7    from this gas credit thing -- scam?

8    A.    We did.  Wells Fargo was able to provide three additional

9    copies of U.S. Treasury checks that were filed in the same

10   transportation names in similar amounts as well.

11        Can I look at my notes and -- from Exhibit 1 I think it

12   has -- yeah.

13   Q.    And when you -- let me ask the next question.

14   A.    Okay.

15   Q.    When you executed the search warrant at 508 Morgan Street

16   on Saturday, did you find three of those checks or copies of

17   three of those checks?

18   A.    We did.  And I know Cargo Express, Inc., was one that

19   wasn't one of the checks funded by Wells Fargo but was another

20   check that we investigated previously.  I believe it was --

21   Q.    And, in fact, has the person that negotiated that check

22   been sentenced?

23   A.    The person has been sentenced.  His -- I earlier stated it

24   was Leroy Carter.  Leroy Carter was the alias that he was

25   using.  His correct name was Demetrius Weddle.

18

1    Q.   Okay.  And had you found from Wells Fargo the Southard

2    Distributing of Tampa, Inc., that you also found at

3    Mr. Shivers' house?

4    A.   Yes, ma'am.  That's correct.

5    Q.   And how much was the amount of that check?

6    A.   Southard Distributing of Tampa?  Is that the one you are

7    applying to?

8    Q.   Yes.

9    A.   $326,764.

10   Q.   And the -- of course, the Transportation Freight and

11   Consultants checks?

12   A.   Transportation Freight Consultants, Inc., check --

13   Q.   Right.

14   A.   -- was 300 -- the return was for $336 -- or $336,262.

15   Q.   Okay.  And what about Packaging Agents of Miami, did you

16   have that check from Wells Fargo?

17   A.   Yes, that check was provided by Wells Fargo.

18   Q.   And did you also find a copy at Mr. Shivers' house?

19   A.   I did.

20   Q.   On the tape, what do you hear Mr. Shivers discussing about

21   these checks?  What was he doing with them?

22   A.   At the time of the tape he was -- and the CI explained to

23   us that he identified exactly where the folder was, and he had

24   a yellow folder.  And he had various tax return information,

25   much of what is found here on this list, and then copies of

19

1    checks and as well as the original treasury check, the five

2    hundred -- from Transportation Distributing Consultants, Inc.,

3    that was not negotiated properly.

4        And when we executed the search warrant the following day,

5    we found all those items together in a folder, in a yellow

6    folder in a FedEx envelope just like the CI explained.  But the

7    -- and on the tape you can -- if that's what you're asking --

8    on the tape you can -- it's very obvious when he is explaining

9    and showing these checks to the CI.

10   Q.   Okay.  And on that -- during that same conversation, did

11   Mr. Shivers explain how he kept his DNA off the tax returns he

12   was preparing?

13   A.   He did.

14   Q.   How did he do that?

15   A.   He described latex gloves and a -- I believe a body latex

16   put over himself.

17   Q.   Okay.  Now, you previously testified that Charlie Shivers

18   described on this tape that he had checks sent to California,

19   New York and Oklahoma.  And you told us that the Transportation

20   and Distributing check -- Consultants check was sent to

21   California.

22       Did you recover from Wells Fargo and from Mr. Shivers

23   checks sent to New York and Oklahoma?

24   A.   We did.

25   Q.   Okay.  During this May 11th conversation, did the

1  Defendant talk about using the same templates?  And, if so,

2  would you tell us and what did he say about that?

3  A.   The CI described that he would use the same templates to

4  file these returns; and the same template as the Transportation

5  Distributing Consultants, I believe, was what he was referring

6  to.

7  Q.   And during your search, did you find another check for the

8  same exact amount of 538,452, the Air Cargos, Inc., return?

9  Was that for the same amount?

10       I show you -- look at Government's Exhibit 1.

11  A.   That is correct.

12  Q.   And both the original check and the replacement check for

13  Transportation and Distributing Consultants was that same

14  amount; is that correct?

15  A.   That is correct.

16  Q.   Did Mr. Shivers characterize what he was doing regarding

17  the hustle?

18  A.   He was playing a game.

19  Q.   Okay.  Did he use the term "a good hustle and free money"?

20  A.   He did.

21  Q.   Did he say how much on that tape -- how much that he had

22  received in the past couple of years from this check scam?

23  A.   The CI stated that he in a bragging fashion described

24  three million in the past two years.

25  Q.   And was that during this recorded conversation?

21

1   A.   It was.

2   Q.   Did he have any -- and did you locate or were you a part

3   of the team executing the search warrant?

4   A.   I was.

5   Q.   And did you locate the documents, exhibits I have

6   previously -- did your team locate the documents I previously

7   marked as Government's Exhibit 2 through 9 at Mr. Shivers' --

8   where he was staying there at 508 Morgan Street?

9   A.   That is correct.

10  Q.   And would you describe where he was staying there.  Did he

11  have a bedroom, or where was he staying?

12  A.   No.  His living quarters was the living room which had a

13  desk, a couch.  And he would stay on the couch; and all of his

14  items, possessions were in that living room.

15  Q.   Okay.  Did he appear to be packing?

16  A.   He did.

17  Q.   And have you reviewed and listened to the tape, May the

18  11th tape?

19  A.   Yes, ma'am, I have.

20  Q.   And have you briefly reviewed the draft transcript?

21  A.   Yes, I did.

22  Q.   And the highlighted quotes dealing with Mr. Shivers' plans

23  to leave, were those on the tape?

24  A.   They were on the tape.

25            MS. MCKENZIE:  Nothing further.

22

1        THE COURT:  Cross, Ms. Hanson?

2        MS. MCKENZIE:  We are offering -- I believe the Court

3   has already accepted 1 through 12.

4        THE COURT:  Yeah, I'll admit those.

5                         -  -  -

6                    CROSS-EXAMINATION

7   BY MS. HANSON:

8   Q.   Afternoon, agent.  How are you?

9   A.   Good afternoon.  Good.

10  Q.   Now, as I understand it, you began the -- I'll just turn

11  that down a little bit.

12       You began the investigation as a result of contact from a

13  CI?  Someone came to you, correct?

14  A.   That is correct.

15  Q.   And that person indicated that he or she had seen a check,

16  a U.S. Treasury check, in a certain location, right?

17  A.   He had a copy of a check, yes.

18  Q.   Okay.  He had a copy of a check.

19       And is it your understanding the copy was obtained from

20  Anthony Shivers' vehicle?

21  A.   That's correct.

22  Q.   As opposed to Charlie Shivers' vehicle?

23  A.   I know Anthony was driving the vehicle.  I don't know

24  whose vehicle it was specifically, but --

25  Q.   Okay.

23

1   A.   He might have been driving Charlie's vehicle.  I don't

2   know.

3   Q.   So it's your understanding when the CI came into

4   possession of that check he was in the presence of Anthony

5   Shivers and not Charlie Shivers, correct?

6   A.   He was not in the presence of Charlie, no.

7   Q.   Okay.

8   A.   Yeah, that's correct.

9   Q.   That's what I'm getting at.

10       And this CI had had a number of conversations with

11   Mr. Anthony Shivers at that particular point, correct?

12   A.   Yes.

13   Q.   And this was as of approximately what time, March or April

14   of 2012?

15   A.   Late February of 2012 and early March of 2012.

16   Q.   Okay.  And that individual was due to be sentenced in

17   federal court in April; is that correct?

18   A.   That is correct.

19   Q.   Now, when this person came to you and gave you a copy of

20   that check, you then went to Wells Fargo with that check?  Or

21   where did you -- what did you do with that check?

22   A.   The United States Treasury first and then figure out where

23   the check was negotiated so I could figure out which bank to

24   subpoena the information for.

25   Q.   So the information that the check was a re-issued refund

24

1   or credit, did that come from the CI or did that come from the

2   U.S. Treasury or Wells Fargo?

3   A.   The CI knew that it was a re-issued check as well.

4   Q.   Okay.  And that information was based on conversations

5   with Anthony Shivers; is that your understanding?

6   A.   Anthony -- yes, yes.

7   Q.   Okay.  At that particular point?

8   A.   At that point, yes.

9   Q.   Okay.  Now, when the check was -- or when you saw the

10   re-issued check itself, there wasn't any indication that the

11   check had been endorsed by Charlie Shivers, correct?

12   A.   No.

13   Q.   Was it signed at all?

14   A.   That particular check was signed, yes.

15   Q.   Okay.

16   A.   The re-issued check?

17   Q.   Yes.

18   A.   The one that I have -- yes.

19   Q.   Could you tell what name was on that re-issue?

20   A.   It was Cordell Barnes.

21   Q.   Did you do any handwriting analysis to confirm whether

22   that handwriting was similar to Charlie Shivers' or not?

23   A.   No.

24   Q.   Or Anthony Shivers' for that matter?

25   A.   No.

25

1    Q.   Okay.  And was there any indication that that check had

2    been mailed to the address of 508 Morgan Street?

3    A.   No.

4    Q.   Anywhere in Atlanta, the Atlanta area?

5    A.   No.

6    Q.   Okay.  It was mailed to another state, correct?

7    A.   That is correct.

8    Q.   Do you know what state off the top of your head?

9    A.   California.

10   Q.   Okay.  California.

11        Now, you then began to monitor some conversations between

12   the confidential informant and Anthony Shivers; is that

13   correct?

14   A.   That is correct.

15   Q.   And those conversations were monitored during April of

16   2012?

17   A.   Correct.

18   Q.   It wasn't until last Friday as I understand it that there

19   was a conversation monitored with Charlie Shivers?

20   A.   Correct.

21   Q.   Okay.  So the conversations that were reviewed between

22   Mr. Anthony Shivers and the CI were pretty much Anthony talking

23   about the alleged scheme, correct?

24   A.   The recorded conversations, yes, that's correct.

25   Q.   Sorry.  Did I say monitored, or what did I say?

26

1   A.   No.  I'm sorry.  I was saying that of recorded

2   conversations that I have Charlie -- the last one of May 11th

3   was the only recorded conversation I have with Charlie.

4   Q.   Okay.

5   A.   If that's what you're getting at.

6   Q.   Okay.  So back to Anthony.

7        So the conversations between the confidential informant

8   and Anthony are concerning this alleged scheme to get back some

9   income tax credits for fuel taxes, correct?

10  A.   Correct.

11  Q.   And Anthony indicates -- it's Anthony who indicates that

12  Charlie is the brains behind the operation; is that right?

13  A.   The CI has stated that Charlie told him that as well at

14  his house.

15  Q.   When did he indicate that Charlie told him that?

16  A.   He was -- the CI was at his house talking with Anthony,

17  and then Charlie came outside.  And I believe -- I have it in

18  my notes, but I believe that was late February.

19  Q.   Okay.  Help me out.  The CI was at whose house?

20  A.   Was at 508 Morgan Street.

21  Q.   Okay.  Which is where you --

22  A.   Which is where Anthony stays sometimes.  But that's where

23  Charlie -- that's the premises -- that's where he lived when he

24  stayed here.  And Charlie came outside, and the CI spoke with

25  him about --

Q.   Okay.  So we have three individuals at least who claim the residence 508 Morgan Street, Charlie Shivers, Charlie Shivers -- excuse me -- Anthony Shivers and another individual; is that correct?

A.   There is another individual that lives there now.  But I don't know if Anthony has claimed that as his residence or not.  But the appearance is that he stayed there from time to time or at sometime he did.

Q.   Same thing with Charlie, correct?

A.   That Charlie stayed there?

Q.   Stayed there from time to time.

A.   Well, I think Charlie that was his place to stay when he came to the United States when he was back home.  So --

Q.   Okay.

A.   -- I'd say more often than not.

Q.   So that was his local residence?  508 Morgan Street was Charlie Shivers' local residence?

A.   Yes.  That I know of since I've -- yes.

Q.   Okay.  Was it also the primary residence of anyone else?

A.   He has I know one roommate.

Q.   Okay.  And do you know that roommate's -- well, I don't need to know his name.  But he has one roommate who's also about the same age, a male; is that correct?

A.   I'm not positive on his age, but he's -- he appeared to be much younger, but I'm not sure off the top of my head how old

28

1   he is.

2   Q.   Okay.  When you reviewed the tax return forms that were at

3   the 508 Morgan Street residence, there was no indication that

4   Charlie Shivers himself filled out those forms, was there?

5   A.   I can't tell because -- yeah, I mean, I can't tell who

6   filled it out because the names are different and --

7   Q.   Right, right.  The names are different.

8        Is some of it in different fonts?

9   A.   I'm not sure if it's in different fonts.

10  Q.   Okay.

11  A.   The actual forms.  But -- what are you -- I don't

12  understand.  They appear to be in the same font I thought, but

13  I don't know.

14  Q.   That's my question.  Does it appear to be in the same

15  font?

16  A.   It looked like it was.  I don't know.

17  Q.   Okay.

18  A.   I haven't -- you know.

19  Q.   All right.  Fair enough.

20       Did they appear to be signed by the same individual?

21       And I am asking you as a layperson.  I'm not asking you as

22  a handwriting expert.  Did they appear to be signed by the same

23  individual?

24  A.   I'm not -- I can't confirm that.  I don't know.

25  Q.   Okay.  Were any of them examined to determine whether

29

1  Charlie Shivers' handwriting was consistent with the signatures

2  on the forms?

3  A.   They have not been examined yet.

4  Q.   Okay.  Now, my understanding is that Anthony, it was

5  Anthony Shivers who believed at some point that Cal or Calvin

6  was being investigated by the police; is that correct -- or by

7  law enforcement in general?

8  A.   That's correct.

9  Q.   Okay.  And that conversation came up between -- sorry --

10 between the confidential informant and Anthony Shivers, right?

11 A.   That conversation did occur, yes.

12 Q.   Okay.  Not between Charlie Shivers and the confidential

13 informant?

14 A.   I'd have to examine the transcript again.  But I don't

15 recall him using a name, Charlie using the name specifically.

16 He did speak about the subject check, the $538,000 one that Cal

17 deposited.  But I'm not positive he mentioned the name.

18 Q.   Okay.  And there was no indication -- okay.  When you

19 spoke about the appearance of Charlie Shivers to have been

20 packing his suitcase when you went to conduct the search at 508

21 Morgan Street, was the indication that you were speaking of the

22 presence of a black suitcase?

23 A.   There was -- yeah, there was a couple of suitcases; but

24 there was one on the couch.

25 Q.   Okay.  How many of them were full?

1   A.   They were at halfway full, halfway empty with paperwork

2   scattered in 'em and --

3   Q.   What kind of paperwork were in them -- was in them?

4   A.   Various tax documents and receipts and gambling documents

5   and --

6   Q.   Any passports in them?

7   A.   There was a passport, yes.

8   Q.   Where?

9   A.   On -- I believe the passport was on -- or not in the

10  suitcase.  I believe the passport was on the desk.

11  Q.   What about -- I'm sorry.  How many suitcases were halfway

12  full?

13       You said they were halfway full.  How many suitcases were

14  halfway full and how many were empty for that matter?

15  A.   Yeah, there was one black bag that had been identified the

16  previous day; and it was empty, and all the pockets were open

17  on it.  There was also a larger suitcase, black one; and it was

18  halfway empty, halfway full it appeared on the couch.

19  Q.   Any clothes inside of it?

20  A.   I believe there were clothes in there.

21  Q.   Any idea how many changes of clothes were inside of it?

22  A.   I can't recall to be honest with you.

23  Q.   Did you go into the garage of the residence?

24  A.   I did go in the garage.

25  Q.   Was there anything in the garage when you went in there?

31

1    A.   There was a grill and some weights.  In the garage that

2    was particular to Charlie that he said was his space -- there

3    was three spaces in the garage, and his space is the one I

4    observed.  And there was -- I believe there was weights and a

5    grill and just --

6    Q.   Personal items?

7    A.   Yeah, I guess.  I mean, there was no paperwork or

8    anything.

9    Q.   Okay.

10   A.   There's nothing I searched or seized from the garage.

11          MS. HANSON:  Okay.  Give me one second.

12          (Pause.)

13          MS. HANSON:  I think that's all I have.

14          THE COURT:  Yes, ma'am.

15          (Pause.)

16                        -  -  -

17                   REDIRECT EXAMINATION

18   BY MS. MCKENZIE:

19   Q.   Was it the plan for Mr. Charlie Shivers to receive the

20   checks or cash them himself?

21   A.   No, it was not.

22   Q.   Were the tax returns -- did you determine what area of the

23   house that was used by Charlie Shivers?

24   A.   I did.

25   Q.   What area was that?

1  A.   The whole living room area according to himself and

2  according to his roommate that was present.

3  Q.   Okay.  And were the tax returns and the checks found in

4  that area?

5  A.   They were.

6  Q.   Were they -- was there a yellow folder?

7  A.   There was a yellow folder.

8  Q.   Had the CI told you anything about the yellow folder?

9  A.   The CI specifically said to look in the yellow folder

10  because that's the folder that had everything that we were

11  looking for, the treasury check -- the copy of the treasury

12  checks and the original check that was issued --

13  Q.   And did you find checks and returns in that yellow folder?

14  A.   We found -- yes, we did.

15  Q.   And is that the folder that was opened during the taking

16  where the dates were being read off the check according to the

17  CI?

18  A.   It appears -- according to the CI, it was.  In listening

19  to the tape-recording, it appears that it was.

20  Q.   And what was -- was Anthony involved in the conspiracy?

21  That is, what I'm asking you is was he trying to get other

22  people to cash checks?

23  A.   He was.

24  Q.   And how was the CI presented?

25  A.   How was the CI presented?

33

1    Q.   Yes.  What could the CI offer?

2    A.   Okay.

3    Q.   What did you tell the CI to offer?

4    A.   We -- in an attempt to get information on Charlie, we got

5    -- we conducted an undercover operation.  And the CI presented

6    an undercover agent posing as a check-casher manager.

7    Q.   Okay.  And it was the CI and the undercover agent were to

8    negotiate these IRS refund checks, correct?

9    A.   That is correct.

10   Q.   Did Mr. Shivers have a -- Charlie Shivers have a

11   reservation to leave Atlanta on Saturday?

12   A.   He did according to his own words.

13   Q.   And where was that?

14   A.   To LAX.

15   Q.   And on the past trips to Australia that you documented,

16   how did he go?  Did he go through LAX?

17   A.   He exited from LAX, yes.

18   Q.   Okay.  And were you able to determine using the resources

19   of the Secret Service how or when Mr. Charlie Shivers returned

20   to the United States following his March the 27th, 2012, trip

21   to Australia?

22   A.   We have been unable to in our database.

23        MS. MCKENZIE:  Could I have just one moment?

24        THE COURT:  Yes, ma'am.

25        (Pause.)

34

1    BY MS. MCKENZIE:

2    Q.   You weren't involved in the prosecution of the CI, were

3    you?

4    A.   No, I was not.

5    Q.   So you don't particularly have direct knowledge of exactly

6    when he was sentenced?

7    A.   Of when he was sentenced?

8    Q.   Yeah.

9    A.   No, I don't.

10   Q.   If I could just correct the record, it was January of

11   2012.

12   A.   Oh, I was -- I was thinking --

13        MS. MCKENZIE:  I don't think it matters, but I don't

14   want to leave something...

15        And because the CI's -- one of his names is mentioned

16   in the transcript, if we could file -- I believe the transcript

17   is Number 11.  If we could file that under seal.

18        THE COURT:  No problem.

19        MS. HANSON:  I don't have anything further for Agent

20   Herrera.

21        THE COURT:  All right.  Agent, you may step down.

22        Any other evidence on behalf of the Government as to

23   probable cause?

24        MS. MCKENZIE:  No, Your Honor.

25        THE COURT:  Any evidence on behalf of Mr. Shivers as

1   to probable cause?

2         MS. HANSON:  Not as to probable cause.

3         THE COURT:  Do you wish to be heard on probable

4   cause?

5         MS. HANSON:  No, Your Honor.  We'll submit it.

6         THE COURT:  All right.  I find that there's probable

7   cause to believe that Mr. Shivers committed the offenses set

8   forth in the criminal complaint, that is, violating 18 United

9   States Code, Section 641, that is, stealing funds and money of

10  the United States, and also 18 United States Code, Section

11  1341, which is using the mails in furtherance of a scheme in

12  artifice to defraud the United States.  And so I'll bind the

13  case over to the grand jury.

14        Does the Government want to say anything else on the

15  issue of detention?

16        MS. MCKENZIE:  The Defendant's own words say it all.

17  He knew that people were being arrested, were being

18  investigated and feared cooperation.  So he was outta here.  He

19  hit the eject button.  He was gone.  And he had all his

20  resources abroad, far more -- a new pad, far more than just a

21  couch here in Atlanta.

22        And the most important thing that I think

23  demonstrates that there's no way he's going to follow the

24  directions of this Court is because he has already lied to an

25  agent of the Court saying this was his ex-girlfriend, trying to

1    minimize to the Probation/Pretrial Services officer his contact

2    with Australia when, in fact, three days before he was talking

3    about his girlfriend, marriage, his bank accounts in Australia

4    and his new pad in Australia and his business in Australia

5    which he also concealed from the -- that residence and the

6    business in Australia, he concealed that from Pretrial

7    Services.

8             He said over and over he's fixing to be across the

9    Pacific.  We know he already was headed out for LAX.

10   Everything he said on the tape has been verified and that he's

11   got -- we can't even stop the 800,000 that he knows is -- he

12   thinks is coming to him from IRS, much less whatever business

13   he's running over in Australia or whatever money he's already

14   moved there to the bank accounts.  And he says he's got enough

15   to subsist over there on tape.

16            So I don't believe there are any sets -- the evidence

17   shows there are no sets of circumstances that would ensure his

18   appearance here in Atlanta to face a jail term which could be

19   as much as ten years if the guidelines are followed at

20   sentencing.

21            THE COURT:  Ms. Hanson?

22            MS. HANSON:  Thank you, Your Honor.

23            Before I begin, Government's Exhibit Number 7 is

24   concerning an account, a bank account with Chase Bank.  I think

25   the Government indicated that that was an account that was

1    owned by Charlie Shivers, but it appears to be according to the

2    document itself an account that's linked to Anthony D.

3    Shivers --

4              THE COURT:  I saw that.

5              MS. HANSON:  -- at the same address.  I don't think

6    it's relevant.  I did not catch that -- I'm sorry -- before the

7    admission of the documents.

8              But, anyway, the Government has no -- they have no

9    rebuttable presumption to invoke in this case.  But there's no

10   indication that there is any violence, so I don't think that's

11   an issue.  The question is whether or not he's a flight risk

12   obviously.

13             He has a girlfriend.  I have inquired as to whether

14   she is an ex-girlfriend or a current girlfriend; and the

15   indication that I have is that she is, in fact, a girlfriend by

16   the name of Christina Sikos -- Sikos, Sikos [phonetic] -- and

17   I'll spell that for the court reporter later -- in Australia

18   that he has gone to visit on a number of occasions.  There's no

19   question about that.  However, there is no indication even in

20   the transcripts that the Government has put forward that

21   Mr. Shivers was ever aware that he was under investigation.

22             I have looked back at the transcript -- and, granted,

23   I'm at a little bit of a disadvantage.  Ms. McKenzie has been

24   kind enough to provide me with that transcript today.  But I

25   have looked through it, and I don't see any indication that he

1   had any knowledge or any perceived -- perception that he was

2   being monitored or surveilled or that even anybody involved in

3   this alleged operation was being investigated.

4          Agent Herrera advised that as far as he knew

5   Mr. Charlie Shivers was not aware of Cal or Calvin or whoever

6   was addressed during the conversation of his intentions with

7   regard to the money that was being held.

8          Mr. Shivers has family here in court today:  His

9   mother, Ms. Sylvia Rosser; his stepfather, Stephen Rosser.

10  They live in East Point, Georgia, as the Pretrial Services

11  Report indicates.  His roommate at 508 Morgan Street, Stephen

12  Penn, is present in court to support him.  He has a daughter

13  who lives in town in Lithonia, Georgia.  And his daughter's

14  mother lives there as well.  In fact, a lot of the transcript

15  that the Court has before you indicates that he has come back

16  on a number of occasions to take care of business with regard

17  to his daughter Chelsea.

18          The Government indicated that there was some pad in

19  Australia, and the only indication I can find there's a pad in

20  Australia occurs on page 9 of the transcript in Government's

21  Exhibit Number 11.  It appears that that -- the context of that

22  conversation is about a passport, not about a place to live,

23  not about a pad or an apartment or a flat or any type of place

24  to live.  He is talking about microchips in passports, the new

25  type of passport that he came back to get to renew his

1    passport.  So the context of that does not show that he is

2    talking about a location that he has to live in Australia at

3    all.

4           There's no indication that he has an established

5    business in Australia.  He had a -- one account that shows with

6    $200, roughly $200 in it.  And then there are a couple of

7    receipts that show $1,000 withdrawals and a hotel -- I guess it

8    was a hotel brochure or travel guide or something to that

9    effect.  So there's no indication that he had any kind of an

10   established business in Australia.

11          So he went back and forth to Australia on a couple of

12   occasions.  So he was planning to go to Australia at some point

13   in the future.  If he didn't know that the Government was on to

14   him, on to any alleged scheme, then it doesn't matter if he was

15   planning to go back and forth to Australia.  I can go to

16   Australia tomorrow, and it's not going to mean anything.  It's

17   not going to mean I'm going to stay there as much as I might

18   like to.

19          He -- as far as the economic loss to the Government,

20   I'm not sure that I understand that argument.  If the five --

21   if the $800,000 is lost, it doesn't matter whether Mr. Shivers

22   is in jail or not.  According to the Government's theory of

23   this scheme, anybody can go out and cash these checks.  It

24   doesn't require Mr. Shivers' presence or assistance or

25   monitoring in order to do that.  So there's really no economic

1   harm to the Government, potential economic harm to the

2   Government if he remains on bond.

3           He has enough contacts to the community.  The

4   Government's in possession of his passport.  Certainly he

5   cannot get anywhere, particularly if he is electronically

6   monitored.  So we would ask the Court to impose pretrial

7   monitoring and supervision, allow him to live at his mother's

8   home in East Point and to be monitored outside out of that

9   residence, impose a curfew, whatever the Court thinks is

10  necessary to ensure that he stays in town.

11          THE COURT:  All right.  Thank you, Ms. Hanson.

12          Is there anything else, Ms. McKenzie?

13          MS. MCKENZIE:  I'd just point out that the Defendant

14  said in his own words that he had a business that grossed three

15  to four million dollars in Australia.  And he said that his

16  co-con- -- well, the N word -- were taking away my breathing

17  room, it's time to go.  That is, he is afraid they were

18  talking.  He sold everything.  It's time to just go.

19          It's clear that he was going because he knew that --

20  about the investigation and he was -- and what this is before

21  he was ever charged.  So now that he is charged and knows that

22  he is the complete focus at this point he's certainly going to

23  get out of town and hit the eject button just the way he said

24  he was going to do.

25          THE COURT:  All right.  Well, I'm going to detain

41

1   Mr. Shivers.  I find that he is both a financial danger to the

2   community and a risk of flight.  First, as to financial danger,

3   he has -- there's probable cause to believe that he has

4   orchestrated a sophisticated fraud scheme, really a theft

5   scheme where he took extraordinary sophisticated measures to

6   avoid being discovered by sending money out of town, wearing

7   gloves, things of that nature, basically stealing the

8   identities of these defunct corporations and thereby obtain a

9   lot of money, some of which, if not most of which, appears to

10  have been deposited outside the United States.

11          He is also a risk of flight for the same reasons.  He

12  has assets out of state that would differentiate Mr. Shivers

13  from Ms. Hanson.  He has money that he can live on once it --

14  once he gets out.  I find that the transcript reflects that he

15  says he has no assets, incomes, liabilities or monthly

16  expenses; and he last stated that he was employed in December

17  of 2007 and he earns money by doing general labor work for

18  cash.  And so those statements are false in light of what he

19  told either the CI or the undercover agent in the May 11th

20  transcript.

21          So he also has somewhat of an inconsistent, if not

22  shaky, residence history.  And so I find that based on the

23  circumstances of this case and balancing all the 3142 factors

24  that there are no conditions or set of conditions that will

25  assure the safety of the community or the appearance of the

42

1    Defendant for trial.  So, therefore, I will detain him pending

2    resolution of the charges against him.

3              Is there anything further in Mr. Shivers' case this

4    afternoon?

5              MS. MCKENZIE:  No, Your Honor, not for the

6    Government.

7              MS. HANSON:  No, not for the defense.

8              THE COURT:  All right.  Well, Mr. Shivers, you are

9    remanded to the custody of the U.S. Marshal.  Good luck to you,

10   sir.

11             (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6            I hereby certify that the foregoing pages, 1 through

7    42, are a true and correct copy of the digitally recorded

8    proceedings transcribed by me in the case aforesaid.

9            This the 27th day of July, 2012.

10

11

12

13            _____

14            Susan C. Baker, RMR, CRR
              Official Court Reporter
15            United States District Court

16

17

18

19

20

21

22

23

24

25